IN THE CIRCUIT COURT OF NICHOLAS COUNTY, WEST VIRGINIA

**LACEY K. GARRETT,**

        **Plaintiff,**

v.

Civil Action No.: 20-C-73

Judge: Stephen O. Callaghan

**PRECISION PIPELINE LLC,**

        **Defendant.**

## COMPLAINT

**COMES NOW** the Plaintiff, Lacey K. Garrett, by counsel, pursuant to Rule 12 of the *West Virginia Rules of Civil Procedure*, and brings this action against her former employer, Precision Pipeline LLC ("Defendant") for race discrimination, hostile work environment based upon race, and reprisal/retaliation in violation of the *West Virginia Human Rights Act* ("WVHRA"), *W. Va. Code* §§ 5-11-9(1) *et seq*. The Plaintiff states the following in support of her Complaint:

### PARTIES AND JURISDICTION

1. Ms. Garrett is a resident of Hephzibah, Richmond County, Georgia, and was employed by Defendant until she was unlawfully terminated on or about October 13, 2018.

2. Ms. Garrett is African-American.

3. Defendant is a Wisconsin Limited Liability Company with a principle place of business located at 3314 56th St., Eau Claire, Wisconsin, 54703. At all times relevant to this Complaint, Defendant was registered to do business in the State of West Virginia and, at times relevant to this Complaint, conducted business in Nicholas County, West Virginia.

4. Defendant is an employer within the meaning of the WVHRA.

5. Jurisdiction and venue are proper in this court.

## FACTS

6. Ms. Garrett worked for Respondent as a laborer from on or about September 3, 2018 until she was terminated on or about October 13, 2018 based upon her race and/or in retaliation for complaining about the racially-charged working environment to which she was subjected during her employment with Respondent.

7. The racially-charged working environment and discrimination to which Ms. Garrett was subjected began almost immediately after she became employed by the Defendant.

8. Specifically, approximately one week into her employment, the only other female employee on her crew, Kim, resigned her position. Ms. Garrett's foreman, Aaron Hyland, had used Kim as his assistant, such that Kim rode around in his truck with him filling out his paperwork instead of working as a laborer. Kim was a blonde-haired Caucasian.

9. When Kim resigned, Ms. Garrett asked Mr. Hyland about becoming his assistant.

10. Another employee indicated to Ms. Garrett that if she was not chosen as the assistant, it would be because she didn't have blonde hair and blue eyes like his two previous assistants.

11. Ultimately, Mr. Hyland told Ms. Garrett that he did not need an assistant.

12. Nevertheless, Respondent subsequently hired another blonde-haired, Caucasian female named Pamela as an oiler. Despite the fact that Pamela was hired as an oiler and contrary to his representation to Ms. Garrett that he did not need an assistant, Mr. Hyland made Pamela his assistant.

13. Just after Pamela was hired, Mr. Hyland made a racially charged joke to Ms. Garrett while driving them away from the jobsite. Specifically, Mr. Hyland joked that black people always die first in horror movies because they always do "dumb sh*t."

14. Shortly after Mr. Hyland's comment, another employee on the crew called a black co-worker "my n***er" in Ms. Garrett's presence. Ms. Garrett made it known to the employee that it was not appropriate to use racial slurs in her presence. The employee then admitted to Ms. Garrett that he is racist and showed her a keychain his father left him with a Ku Klux Klan emblem on it.

15. Another employee also chimed in and stated that he sometimes has to catch himself to keep from saying the "N" word.

16. Ms. Garrett made a verbal complaint to Mr. Hyland about the use of the "N" word, but he just brushed it off.

17. Subsequently, Mr. Hyland, Pamela, and Ms. Garrett were sitting in a vehicle at the end of the day while Mr. Hyland was finishing up some paperwork with two inspectors. One of the inspectors jokingly squinted as he looked into the back seat where Ms. Garrett was sitting as if he could not see her through the tinted windows.

18. Although Ms. Garrett did not assume any racially charged intent from the inspector's joke, Pamela stated, "What an a**, you're not *that* dark." Pamela then continued on to say that Ms. Garrett was "not black, black" and that she had "seen worse."

19. On another day, Pamela and Ms. Garrett were discussing how Mr. Hyland rarely gave Ms. Garrett specific direction on what to do for the day like he did with her co-workers. During the conversation, Pamela commented that it is impossible for Ms. Garrett to just blend in some where because "it's not like its dark outside."

20. Mr. Hyland was present during the conversation about blending in but refused to reprimand Pamela for the comment.

21. Later the same day, Ms. Garrett was waiting on Mr. Hyland to pick her up after she had been spotting for equipment operators. As the operators were leaving the site, one of them got

on the radio in Ms. Garrett's presence and asked Mr. Hyland, "What are we supposed to do with this little black girl?"

22. Ms. Garrett then got on the radio and expressed her displeasure at being called a "little black girl." But rather than reprimand or discipline the operator for calling Ms. Garrett a "little black girl," Mr. Hyland simply told him over the radio to instruct Ms. Garrett to go with the operators.

23. Ms. Garrett later complained to Mr. Hyland about being called "little black girl", but he dismissed it as no big deal. His body language and dismissiveness offended Ms. Garrett and made her feel uncomfortable.

24. After Ms. Garrett complained to Mr. Hyland about being called a "little black girl," Mr. Hyland and Pamela largely stopped speaking to her.

25. Ms. Garrett next complained to a straw boss about the operator calling her a "little black girl." The straw boss first laughed about Ms. Garrett's Complaint, but then assured her he would look into it.

26. Ms. Garrett also gave the straw boss a summary of the other racially-charged incidents and advised him she no longer felt comfortable complaining to Mr. Hyland because he had failed to remedy the racially-charged environment.

27. After Ms. Garrett complained to the straw boss, Mr. Hyland began to target her, spoke to her in an abusive manner, and kept pairing her with the operator who called her a "little black girl." The straw boss later confirmed to Ms. Garrett that he had told Mr. Hyland about the complaints she had made to him.

28. On or about October 6, 2018, Ms. Garrett complained to the company's superintendent about the racially charged working environment. She also submitted a six-page, handwritten summary of the racially-charged incidents to which she had been subjected.

29. In her written statement, Ms. Garrett stated that she believed she was being mistreated due to her ethnicity, teased about the color of her skin, and retaliated against for reporting the racially-charged incidents. Additionally, she stated that she felt unsafe, uncomfortable, and nervous.

30. The union steward and the company's safety man were also in the room when Ms. Garrett complained to the superintendent. After the superintendent left the room, the union steward tried to excuse the racial behavior and stated that Ms. Garrett should not be offended. The safety man also inexplicably expressed surprise that she could "talk so well" and commented that she talked "a lot better than a lot of 'other people' out there."

31. Subsequently, as Ms. Garrett joined her crew in anticipation for traveling to the worksite, she heard Mr. Hyland state to another employee that "if she comes back out here she will be "getting in the f***ing van" instead of riding with him.

32. Afterward, no one would talk to Ms. Garrett and she was isolated on a flagging job away from the rest of the crew.

33. The next day, the safety man and Mr. Hyland brought Ms. Garrett in and informed her that she would have to permanently do the flagging job for the rest of her time on the job, which isolated her from the rest of the crew.

34. The safety man later gave Ms. Garrett paperwork to sign about her racial complaints. However, she discovered them to be inaccurate and refused to sign them.

35. The safety man ensured her that he would fix the documentation regarding her complaints and bring them back. However, Ms. Garrett never saw the paperwork again.

36. Just prior to her termination, Ms. Garrett asked the safety man about the paperwork, but he told her that they did not need her to sign it after all. She then asked for a copy, but the safety man refused to give her a copy.

37. While serving as a flagger, Ms. Garrett was riding to the jobsite in a vehicle with another laborer who had witnessed Ms. Garrett's discussions with the safety man regarding the paperwork about her complaints. The laborer stated that he did not feel comfortable riding with her and did not want to be isolated like she was being isolated.

38. The next morning, the laborer told the safety man he did not like the way Ms. Garrett drove without any basis for such a complaint.

39. The safety man then began yelling at Ms. Garrett, removed the laborer from the truck, and allowed him to ride with the rest of the crew.

40. The next morning, the laborer who had falsely complained about Ms. Garrett's driving came to her truck and said that he was supposed to drive now. Ms. Garrett refused, telling him that she had not been instructed by anyone to turn the keys over to him.

41. Ms. Garrett was concerned that she would get in trouble for turning over to another employee, without management approval, a company truck assigned to her.

42. The next day, the safety man informed Ms. Garrett that she was being terminated. The termination papers stated that she did not get along well with others.

43. Ms. Garrett asked for a copy of her termination papers, but the safety man refused and threatened to call the police on her if she did not leave.

## COUNT I
## Race Discrimination
## in Violation of the WVHRA

44. Plaintiff realleges and incorporates as if fully set forth herein, each and every allegation contained in the preceding Paragraphs.

45. The Plaintiff is a member of a protected class pursuant to the WVHRA based upon her race.

46. Plaintiff was subjected to adverse employment decisions, which were based, in whole or in part, upon her race.

47. The Plaintiff was subjected to disparate treatment based upon her race.

48. The adverse employment decisions and disparate treatment would not have occurred but for the Plaintiff's status as an African American.

49. As a direct and proximate result of Defendant's acts and/or omissions, Plaintiff has suffered and will continue to suffer economic damages, including past, present, and future lost wages and benefits, in an amount to be determined by a jury.

50. As a direct and proximate result of Defendant's actions, Plaintiff is entitled to damages for annoyance, inconvenience, embarrassment, humiliation, loss of dignity, and emotional distress in an amount to be determined by the jury.

51. The damages suffered by the Plaintiff are the direct and proximate result of conduct carried out by the Defendants with actual malice toward the Plaintiff and/or a conscious, reckless, and/or outrageous indifference to the health, safety, and welfare of others, including the Plaintiff. Accordingly, the Defendant is liable to the Plaintiff for punitive damages in an amount to be determined by the jury.

52. As a result of Defendant's unlawful discriminatory practices, Plaintiff is entitled to the costs of litigation, including attorneys' fees and costs.

## COUNT II
### Hostile Work Environment Based Upon Race in Violation of the WVHRA

53. Plaintiff realleges and incorporates as if fully set forth herein, each and every allegation contained in the preceding Paragraphs.

54. During Plaintiff's employment with Defendant, she consistently experienced severe, pervasive, hostile, and abusive conduct directed toward her by management and non-management employees of the Defendant based upon her race. Specifically, Plaintiff was persistently subjected to ongoing racially charged jokes, stereotypes, epithets, innuendo, disparate treatment, and other hostile, abusive, and offensive conduct by co-workers and management.

55. The subject conduct was unwelcome.

56. The subject conduct was based upon Plaintiff's race, a protected class pursuant to the WVHRA.

57. The subject conduct was ongoing and was sufficiently severe and pervasive to alter the conditions of Plaintiff's employment.

58. The subject conduct was committed by and in the presence of management-level employees of the Defendant, such that the conduct is imputable to the Defendant.

59. The subject conduct constituted an unlawful discriminatory practice pursuant to the WVHRA.

60. As a direct and proximate result of Defendant's acts and/or omissions, Plaintiff has suffered and will continue to suffer economic damages, including past, present, and future lost wages and benefits, in an amount to be determined by a jury.

61. As a direct and proximate result of Defendant's actions, Plaintiff is entitled to damages for annoyance, inconvenience, embarrassment, humiliation, loss of dignity, and emotional distress in an amount to be determined by the jury.

62. The damages suffered by the Plaintiff are the direct and proximate result of conduct carried out by the Defendant with actual malice toward the Plaintiff and/or a conscious, reckless, and/or outrageous indifference to the health, safety, and welfare of others, including the Plaintiff. Accordingly, the Defendant is liable to the Plaintiff for punitive damages in an amount to be determined by the jury.

63. As a result of Defendant's unlawful discriminatory practices, Plaintiff is entitled to the costs of litigation, including attorneys' fees and costs.

## COUNT III
### Reprisal/Retaliatory Discharge
### In Violation of the Human Rights Act

64. Plaintiff re-alleges and incorporates herein the allegations contained in the preceding paragraphs.

65. It is an unlawful discriminatory practice to "engage in any form of reprisal or otherwise discriminate against any person because he or she has opposed any practices or acts forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under the [WVHRA]." WV CODE § 5-11-9(7)(C). *See also id.* at § 5-11-9(7)(A).

66. Defendant, through the acts of its agents and employees, retaliated against Plaintiff, which retaliation was motivated, in whole or in part, by her opposition to unlawful racial discrimination including her complaints to management about the racially-charged hostile environment to which she was subjected during her employment..

67. Based upon the foregoing, Plaintiff engaged in activity protected by the WVHRA.

68. Defendant was aware of Plaintiff's protected activities.

69. Plaintiff was subsequently discharged within a short time period after she engaged in protected activity, such that it can be inferred that Plaintiff was terminated in retaliation for such protected activity.

70. Plaintiff's termination was carried out, in whole or in part, in retaliation for her protected activity.

71. As a direct and proximate result of Defendant's acts and/or omissions, Plaintiff has suffered and will continue to suffer economic damages, including past, present, and future lost wages and benefits, in an amount to be determined by a jury.

72. As a direct and proximate result of Defendant's actions, Plaintiff is entitled to damages for annoyance, inconvenience, embarrassment, humiliation, loss of dignity, and emotional distress in an amount to be determined by the jury.

73. The damages suffered by the Plaintiff are the direct and proximate result of conduct carried out by the Defendant with actual malice toward the Plaintiff and/or a conscious, reckless, and/or outrageous indifference to the health, safety, and welfare of others, including the Plaintiff. Accordingly, the Defendant is liable to the Plaintiff for punitive damages in an amount to be determined by the jury.

74. As a result of Defendant's unlawful discriminatory practices, Plaintiff is entitled to the costs of litigation, including attorneys' fees and costs

### Prayer for Relief

**WHEREFORE**, Plaintiff prays for the following relief:

1. That the Court enter judgment against the Defendants on all counts alleged in this Complaint;
2. All remedies afforded under the WVHRA;

3. All common law remedies to which Plaintiff is entitled.

4. Pre- and post-judgment interest as provided by law;

5. Attorneys' fees and costs; and

6. Plaintiff is not seeking reinstatement at this time.

**PLAINITFF DEMANDS A TRIAL BY JURY**

                                                       **LACEY K. GARRETT**
                                                       **By Counsel:**

_/s/ Michael P. Addair_

Michael P. Addair, Esquire (WVSB # 10561)
**ADDAIR LAW OFICE PLLC**
P.O. Box 565
Hurricane, West Virginia 25526
Telephone: (304) 881-0411
Facsimile: (304) 881-0342
maddair@addairlawoffice.com
*Counsel for Plaintiff*